**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| PETER MACZKO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARB GAMING, LLC, d/b/a Modo.us,<br><br>Defendant. | Case No. 0:26-cv-3396<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Peter Maczko individually and on behalf of the other members of the below-defined Minnesota class (the "Class"), hereby alleges against Defendant ARB Gaming, LLC, d/b/a Modo.us ("Modo" or "Defendant"), upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## I. BACKGROUND

1. This Class Action lawsuit is brought by Plaintiff seeking damages, declaratory, injunctive, and equitable relief individually and on behalf of the other Class members, each of whom are Minnesota residents who have paid and lost money or other things of value on Modo.us (the "Class").

2. Modo owns and operates a popular, casino-oriented internet gaming website called www.Modo.us.

3. Online casino gambling is prohibited in Minnesota.

4. Minnesota law criminalizes making bets and operating gambling enterprises, see Minn. Stat. §§ 609.75–609.76, and limits "lawful gambling" to narrow, licensed exceptions, such as charitable gambling conducted by licensed nonprofit organizations the state-operated lottery, licensed pari-mutuel horse racing, and tribal gaming conducted pursuant to tribal-state compacts. Modo fits within none of these exceptions.

5. Yet Modo.us is accessible and operational in Minnesota.

6. Modo does not operate to promote or market another product or service; Modo.us is the product or service.

7. Modo.us operates indefinitely and not for a fixed period of time.

8. On its website, users can play "Hundreds of Casino-Style Games," like blackjack, slots and other "classic table games" (the "Chance Games").

9. The Chance Games are games of chance within the meaning of Minnesota law, which defines a "bet" as "a bargain whereby the parties mutually agree to a gain or loss by one to the other of specified money, property or benefit dependent upon chance although the chance is accompanied by some element of skill." Minn. Stat. § 609.75, subd. 2.

10. The Chance Games are identical to slot machines, video poker, and other casino games.

11. Modo offers prizes, such as cash or cash-equivalent gift cards, to online participants who wager money to play the Chance Games.

12. Even then, as further alleged below, free play doesn't offer the prizes that attract Minnesota residents, including Plaintiff, to Modo.us. Instead, Minnesota residents, including Plaintiff, access Modo.us to win prizes, just as Modo intends. And the only way to win prizes is with Sweeps Coins.

13. Nonetheless, the theoretical availability of free chances is not dispositive of whether a game is a gambling scheme under Minnesota law. The overwhelming majority of participants pay real money for their chances to win, and the sale of Sweeps Coins to play games of chance for real-world prizes is precisely the conduct Minnesota's gambling statutes prohibit. The Minnesota Attorney General has publicly rejected the industry's virtual-currency framing, stating that rebranding casino chips as virtual currencies does not make these online gambling operations lawful.[1]

14. Since Modo requires participants to submit consideration for a chance to win a prize, it is an illegal gambling operation in Minnesota.

---

[1] *See* Office of Minn. Att'y Gen., *Attorney General Ellison directs illegal gambling websites to stop offering services in Minnesota* (Nov. 5, 2025), https://www.ag.state.mn.us/Office/Communications/2025/11/05_IllegalGambling Websites.asp.

15. The legality of Modo is not in question in states like Minnesota with strict gambling laws.

16. On July 1, 2026, the District Court for the District of Minnesota in *Wolters v. Sweepsteaks Limited*, No. CV 25-3280 (JRT/JFD), 2026 WL 1894240 (D. Minn. July 1, 2026), denied the defendants motion to compel arbitration, finding that the defendant's gambling website is "illegal in Minnesota." The defendant, Sweepsteaks Ltd. ("Stake"), is a primary competitor of Modo and operates a materially similar online gambling platform.

17. The State of Connecticut charged another competitor of Modo, High 5 Casino's parent company High 5 Games with 1,065 criminal counts of conducting illegal gaming activity in Connecticut and ordered High 5 Casino to immediately shut down the operation of high5casino.com in that state.

18. That same week, the Maryland Lottery and Gaming Control Agency notified High 5 that the agency had commenced an investigation into the website for operating an illegal gambling website in that state.

19. On February 7, 2025, a jury in a federal court in the Western District of Washington found the operators of high5casino.com liable for nearly $25 million. Six months earlier, the district court had already determined on summary judgment that high5casino.com was an illegal gambling website, and so the jury's only job

was to decide civil damages. *Larsen v. PTT, LLC* (W.D. Wash. 2024) 737 F. Supp.3d 1076.

20. Minnesota's own law-enforcement authorities have reached the same conclusion about the "sweepstakes" casino model Modo employs.

21. In June 2025, the Alcohol and Gambling Enforcement Division of the Minnesota Department of Public Safety notified operators of online sweepstakes casinos that the sweepstakes-based model of gambling is illegal in Minnesota.

22. On November 5, 2025, Minnesota Attorney General Keith Ellison sent letters to fourteen operators of illegal gambling websites, including social sweepstakes casinos that use the same dual-currency, "sweeps coins" model that Modo uses, directing them to stop offering online gambling in Minnesota because their operations violate Minnesota's criminal gambling statutes, Minn. Stat. §§ 609.755–609.76, and Minnesota's consumer-protection laws.[2]

23. Plaintiff and Class members each wagered money or other things of value on Modo.us and lost.

## II. THE PARTIES

16. Plaintiff Peter Maczko is a Minnesota citizen and a resident of Mendota Heights, Minnesota. Plaintiff wagered and lost money on Defendant's illegal

---

[2] *See supra* note 7; *see also* Minn. Dep't of Public Safety, Alcohol and Gambling Enforcement Division correspondence (June 2025).

gambling website. As a result, he suffered an injury in fact resulting in the loss of money and/or property that is recoverable in Minnesota. Plaintiff did not know Modo.us was illegal gambling in Minnesota. Based on Modo's advertising and website, Plaintiff thought that Modo.us was legal in and permitted by the State of Minnesota, among other things. Had he known the truth, he would not have participated in online gambling on Modo.us.

17. Defendant ARB Gaming, LLC is a for-profit business entity registered in Delaware and with its registered office at 13802 N Scottsdale Rd, Suite 151-94, Scottsdale, Arizona. Defendant owns and operates Modo.us. Through its website, Defendant conducts business in Minnesota, including this District. Modo is not registered to do business in Minnesota.

## III. JURISDICTION AND VENUE

18. This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiff and one or more of the other Class members are citizens of a different state than Defendant.

19. Venue is proper in this District under 28 U.S.C. § 1391 because Modo is deemed to reside in any judicial district in which it is subject to personal jurisdiction. Additionally, Plaintiff wagered and lost money on Modo in this District, and Modo has marketed and advertised its website in this District, made its website

accessible in this District, accepted wagers in this District, and paid out prizes in this District, among other things. Thus, a substantial part of the events or omissions giving rise to the claim occurred within this District.

20. This Court has personal jurisdiction over Plaintiff because Plaintiff resides in Minnesota and consents to the jurisdiction of the Court.

21. This Court has personal jurisdiction over Modo because Modo, at all times relevant hereto, has systematically and continually conducted, and continues to conduct, business in this State, and this lawsuit arises out of those contacts with Minnesota.

22. Specifically, Modo is an interactive website used for commercial purposes – specifically, gambling.

23. It was foreseeable and intended that Minnesota residents would use the Modo website because Defendant knew that Minnesota residents frequently gamble on the website and that they would continue to do so.

24. Defendant knows that Minnesota residents use the website because it asks users to disclose which state they live in when registering to use the website.

25. In fact, Modo encouraged it by not listing Minnesota as an excluded territory.

26. Modo also advertises to Minnesota residents in Minnesota, and emails Minnesota residents about games and other offers it seeks to promote or the status of their accounts and transactions.

27. In other words, Modo reached into Minnesota and invited its customers to participate on its website.

28. Modo appeals to, and profits from, an audience in Minnesota, and Minnesota residents form a significant portion of the website's customer base and revenue.

29. Modo also collects information and data about Minnesota residents.

30. Defendant took steps to ensure that Minnesota residents would have access to the website so that they could gamble online. Specifically, there is widely available technology that allows websites to detect the location of a website visitor, including the state in which they are located. Reputable online gambling companies utilize this technology to prevent website users from using their websites if the website user is located in a state where online gambling is illegal, like Minnesota. However, Defendant made an affirmative decision to not use that technology for the Modo website, because that would prevent Defendant from profiting from gambling in Minnesota.

## IV. THE PROBLEM OF ONLINE GAMBLING

31. The online gambling industry is profiting from gambling addiction the same way the Sackler family once profited from opioids.

32. The online gambling industry is profiting from gambling addiction the same way the Sackler family once profited from opioids.

33. For decades, the proportion of Americans diagnosed with pathological gambling held steady at less than 1 percent, with 7 million Americans believed to be suffering from a gambling addiction at an annual "social cost" of $14 billion. But those numbers have skyrocketed with the advent of online gambling: from 2021 to 2022, there was a 45 percent increase in the number of calls, texts, and messages to the National Problem Gambling Helpline.

34. According to one study, up to 30 percent of problem gamblers have attempted suicide, while a larger percentage of such individuals reported having suicidal ideations.

35. The fallout is not limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers.

36. During the last five years, online gambling websites have proliferated with no way to reduce the ensuing harm. This shift is already evident with the gamblers seeking treatment, who tend to be younger, predominantly male, and raised

on smart phones. This rise also includes a relatively new phenomenon: gambling addiction among minors under the age of 18.

37. Whereas brick-and-mortar casinos could take steps to exclude minors, the easy access to online gambling has made it easier for underage minors to participate in gambling.

38. Treating online gambling addiction poses challenges that are different from other forms of addiction. For an individual with substance use disorder, safety measures like disposing of all alcohol or drug paraphernalia or avoiding triggering social events are key to treatment.

39. Things are not so clear-cut when treating digital gambling because for most people, mobile devices have become a necessity of life. So, it's not a question of avoiding the drive to the casino, but instead, a constant struggle to avoid the temptation to gamble from home, work, restaurants, the grocery store, while on vacation, and anywhere else where the gambler's device can receive a signal. Furthermore, unlike the billions of dollars of federal funding dedicated to alcohol, tobacco and drug addiction programs, there are no federal funds allocated to support problem gambling services.

40. To make matters worse, although the casino gaming industry is one of the most regulated businesses in the United States, online gaming websites like High5casino.com are unlicensed and unregulated.

41. A gaming license is a privilege that requires, among other things: (1) meeting state standards; (2) background checks on company officers and directors; (3) adherence to responsible gaming programs; (4) anti-money laundering measures; and (5) myriad other requirements concerning data privacy, security, and responding to customer complaints. Defendant dodges all these requirements.

42. As one gambling treatment provider warned, "[u]nregulated platforms [like Modo] can pose significant risks for players struggling with gambling addiction. The lack of proper safeguards often exacerbates financial and emotional stress, making it harder for individuals to regain control."

43. For example, Modo accepts credit cards to pay for gambling on its website, in violation of the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361-5367. As a result, people, including Plaintiff, have racked up massive debt gambling on Modo.

44. Modo also deprives state and local governments of tax revenues that legitimate, regulated gaming operations generate.

45. The bottom line is that Modo lets people play online casino games and wager real money while skirting regulation and licensing, offering inadequate player protections, exploiting adolescents, and siphoning revenue from state governments.

## V. DEFENDANT MODO OPERATES A GAMBLING WEBSITE

42. Defendant operates a popular gambling website available at Modo.us. Defendant admits that it offers Chance Games.

43. When users log onto the website, the first thing they see is an array of colorful, digital slot machines and other games of chance, along with information about the user's gambling balance near the top of the screen (denoted with the gold and green circles near the top right corner):



44. The website offers "live" table games where online players interact directly with live dealers visible via a webcam to play games like blackjack and roulette:






45. Just like one would see on the floor of a brick-and-mortar casino in Las Vegas, the digital slot machines come in a wide variety of styles and themes, such as the examples shown below:






46. Modo.us also contains a detailed explanation of the "volatility" of its slot machines, which is a common term used in the casino industry to describe how frequently a slot machine will hit a winning combination and the average payout size a gambler can expect:



Articles in this section

Can I play games on my smart phone device?

What is a Random Number Generator (RNG)

What is Game Volatility

## What is Game Volatility

2 years ago · Updated

**Volatility:** a measure of how frequently a slot machine pays out and how large the payouts are. It is used to indicate the likelihood of hitting a winning combination and the potential size of the win.

**Low volatility:** refers to slot games that offer small, frequent wins rather than large, infrequent ones. This means that players can expect to receive a steady stream of payouts over time, although the amount of each payout may be relatively small. These types of games can be attractive to players who enjoy a more predictable, steady pace of play and prefer to avoid the ups and downs of high volatility games.

**High volatility:** Games that offer the potential for large payouts, but they may not occur frequently. These types of games may result in either a big win or no winnings at all during a short gameplay session. In contrast, low volatility slots provide smaller, more frequent payouts.

There are also slot games with **Medium Volatility**, which fall in between the extremes of high and low volatility. These games offer a balance of frequency and size of payouts, providing a mix of small and large wins over time.

The choice of which game to play depends on your personal preference. If you enjoy the excitement of potentially winning big, you may prefer high-volatility games. If you prefer a more relaxed, consistent gameplay experience, low-volatility games may be a better fit for you. Remember, slots are games of chance and are meant to be enjoyed as a form of entertainment.

On Modo.US, volatility is clearly displayed before entering each game so that you, as a player, can get a sense of the playing experience you will get before entering.

47. Despite the clear purpose of the website, however, the word "gambling" is never used. Instead, Defendant gaslights users—including vulnerable populations struggling with gambling disorder—with euphemisms like "social gaming" and "sweepstakes."

48. Unlike any legitimate "sweepstakes," however, it is common for individual users in Minnesota to lose tens of thousands of dollars gambling on the website. A traditional sweepstakes promotion is a limited-term event designed to

attract consumer attention to a product or business, and typically expires after a few weeks or months. Modo.us' fake sweepstakes, however, runs perpetually and is not offered to promote another product or business—instead, the online gambling *is* the business being promoted.

## VI. MODO HAS MASSIVELY SCALED UP AN OLD GIMMICK THAT CRIMINALS ONCE TRIED TO USE TO EVADE GAMBLING LAWS

49. Modo will ask the Court to disbelieve its own eyes and conclude that Modo.us is not really a gambling operation, but instead offers legal "sweepstakes." That is an old gimmick that was once popular among criminals in the early 2000s. As detailed below, courts and law enforcement agencies consistently determined that the same business model Modo utilizes today is a pretext for illegal gambling. A federal district court has already held on summary judgment that one of Modo's competitors that operates materially the same way is an illegal gambling operation. *See Larsen v. PTT, LLC*, 737 F. Supp. 3d 1076 (W.D. Wash. 2024).

### A. The Internet Café "Sweepstakes" Crime Trend Of The Early 2000's

50. The early 2000s saw a nationwide crime trend where criminals attempted to evade gambling laws by offering gambling at so-called "Internet cafés." These operations—often located in suburban strip malls— "promoted" the sale of products such as Internet time or long-distance telephone minutes by offering "free" sweepstakes entries to customers. When customers purchased the product, they received a corresponding number of "sweepstakes" points for each dollar spent.

Customers then used those sweepstakes points to play "casino-style" slot machine games for cash prizes at computer terminals provided at the Internet cafés.

51. Gambling (betting) in Minnesota likewise turn on the combination of prize, chance, and consideration (i.e., payment). See Minn. Stat. § 609.75. By artificially separating the consideration from the chance to win real money, criminal operators of Internet cafés believed that they could evade state gambling laws, while claiming that the activities were no different from the kinds of sweepstakes promotions occasionally offered by Publisher's Clearing House and McDonalds.

52. Courts and state law enforcement officials across the United States repeatedly determined that such tactics were an obvious pretext and cover for illegal gambling.

53. Minnesota's Attorney General and its Alcohol and Gambling Enforcement Division have likewise concluded that the modern, online version of this scheme — the dual-currency "social sweepstakes casino" — is illegal gambling under Minnesota law.

54. The Arkansas Supreme Court found that vending machines offering games of chance through promotional sweepstakes, even when paired with the purchase of a nominal item, amounted to illegal gambling devices under Ark. Code Ann. § 5-66-104. *Pre-Paid Solutions, Inc. v. City of Little Rock*, 343 Ark. 317, 34 S.W.3d 360 (2001). Crucially, the sweepstakes format, where participants risk

property for the opportunity to win additional rewards, likewise meets the statutory definition of gambling under Minnesota law. This precedent establishes that sweepstakes schemes designed to circumvent gambling laws are nevertheless unlawful, thereby supporting the claims against Modo.us and similar operations.

55. In Mississippi, an individual was convicted of racketeering and gambling charges in connection with an Internet café where—like here—customers could play simulated games that resembled gambling programs, such as slot machines, keno, and poker. *Moore v. State*, 309 So. 3d 7, 9 (Miss. Ct. App. 2020). Customers needed a "sweepstakes" code to play the game, but customers could not purchase a sweepstakes code outright. Instead, customers received sweepstakes codes by purchasing something else in the store, such as food or phone minutes.

56. The Alabama Supreme Court addressed the issue directly in *Barber v. Jefferson Cty. Racing Ass'n, Inc.,* 960 So.2d 599, 602-605 (2006), where the owners opened an "[I]nternet café" that offered a continuous "sweepstakes promotion" whereby customers could receive 100 entries for each dollar spent on computer access and Internet time. The Alabama Supreme Court rejected every argument for why this gimmick was not gambling—including the argument that there was "no consideration" for the entries because people were only buying Internet time, and because people had the option to obtain free chances by mail without purchasing Internet time. *See id*. at 612.

57. The outcome in *Barber* is consistent with the view taken by courts and law enforcement agencies across the country.

58. In 2015, the California Supreme Court addressed Internet café gambling in *People ex rel. Green v. Grewal*, 61 Cal. 4th 544 (2015), where the defendant sold Internet time on computer terminals. The defendant promoted the sale of Internet time and other products with a “sweepstakes” giveaway, wherein the defendant provided 100 “sweepstakes points” for each dollar spent, which could then be used to play games of chance. The defendants denied that the operation involved gambling because they were supposedly only selling computer time, and that the sweepstakes games were “not gambling” but instead a “promotional game.” The Kern County District Attorney obtained a civil injunction for violations of California’s gambling laws, and that injunction was affirmed on appeal.

59. In 2011, three individuals—including a Fall River, Massachusetts City Council member—were indicted and charged with various gaming charges in connection with the operation of two Internet cafés in Massachusetts. The defendants unsuccessfully argued that players were only paying for Internet time and that any gambling that occurred involved legitimate sweepstakes offers. The Massachusetts Attorney General stated unequivocally that this conduct constituted illegal gambling.

60. The Ohio Court of Appeals said it best when rejecting a similar sweepstakes scheme in *City of Cleveland v. Thorne*, 987 N.E.2d 731 (2013): "**the justice system is not some lumbering oaf who must ignore the patently obvious gambling scheme apparent here simply because of a contrived separation between consideration and the scheme of chance**." The court added, "there is no justification for ignoring the nature of the transaction simply because the system is designed in such a way as to artificially isolate one part of the illegal transaction from another. The justice system is not so blinded by chicanery."

### B. Modo.us Is An Online Version Of An Internet Café

61. Like the criminal Internet cafés in operation a decade ago, Defendant here attempts to separate the element of consideration from gambling by offering a two-tiered system of virtual coins, both of which function like casino chips.

62. The first type of virtual currency –called "Gold Coins" – can be used to play with no potential for redeeming any prizes. When gambling with Gold Coins, a player can only win or lose Gold Coins, which can be used to place wagers on the various games. The second type of virtual currency – called "Sweeps Coins" – can be used to play all of the same games on the website, except they carry real monetary value and can be redeemed for prizes and money.

63. The second type of virtual currency – called "Sweeps Coins" or sometimes "Sweepstakes Coins"– can be used to play the same casino-style games

in a "promotional sweepstakes mode," where they carry real monetary value and can be redeemed for prizes and money.

64. To get Sweeps Coins, website visitors typically must purchase them in a package with Gold Coins. The more Gold Coins a user purchases, the more Sweeps Coins the user also receives. So, in effect, when a person buys Gold Coins, they are also buying Sweeps Coins as part of a package.

65. Modo pretends that the "Sweeps Coins" are a free "bonus" added to the sale of Gold Coins, but as shown above, that is exactly what the owners of Internet cafés unsuccessfully argued before. The reality is that generally, both coins must be purchased, and Modo will only sell them together as a package. There are two other problems with the notion that Sweeps Coins are just a "free" add-on bonus to the Gold Coins.

66. First, as noted above, most people ignore the Gold Coins after buying them.

67. Second, the number of Sweeps Coins is essentially a proxy for the amount of real money spent or won. That is because, depending on the package bought, there is a 1:1 or a nearly 1:1 correlation between the number of dollars spent and the number of Sweeps Coins provided in each purchase. So, for example, if someone spends $2 dollars ostensibly to buy Gold Coins, they get 2 Sweeps Coins;

whereas if they spend $5, they will get 5 Sweeps Coins, and so on. If someone purchases $1000 on virtual coins, they get 1005 Sweeps Coins.

68. Likewise, Sweeps Coins can be cashed-out for real-world money and are redeemable for cash on a 1:1 basis. So, for example, 100 Sweeps Coins can be redeemed for $100. This is how Internet cafés worked.




67. Defendant claims that no purchase is necessary to buy Sweeps Coins and that they are just a "bonus" added to the purchase of Gold Coins, but the reality is that generally, both coins must be purchased, and Defendant will only sell them

together as a package. As noted above, claiming that sweepstakes tokens are just a free bonus is an old tactic that criminal operators of Internet cafés unsuccessfully used to evade gambling laws.

68. Players can use real currency to purchase additional virtual Gold Coins and Sweeps Coins through the website. In this way, the purchase of virtual coins is like what happens when a player purchases casino chips in a brick-and-mortar casino, which can then be used to place wagers at table games.

69. There are several other factors that show that the true purpose of Defendant's website is gambling, and that like the Internet cafés that preceded the launch of Defendant's website, the use of the term "sweepstakes" is a pretext for gambling.

70. First, the casino-like atmosphere and imagery associated with the website, as well as the use of the word "casino" in the website name, is evidence that the true purpose of the website is to promote gambling, as opposed to a sweepstakes promotion of some other good or service.

71. Second, the duration of the "sweepstakes" promotion also demonstrates that the true purpose of the website is not to promote a bona fide consumer good or service, but instead gambling. A traditional sweepstakes promotion is a limited term event designed to attract consumer attention to a product or business, and ordinarily

expires after a few weeks or months. In contrast, Defendant's purported "sweepstakes," runs perpetually.

72. Third, the typical payout percentage for a temporary promotional sweepstakes is a small percentage of revenue earned by the company. For example, the typical grand prize for McDonald's annual Monopoly-themed sweepstakes is usually about $1 million, which is a tiny fraction of the *billions* of dollars McDonald's earns each year. By contrast, casinos typically pay out between 80-96 percent of their revenues (sometimes referred to as the "return to player" or "RTP"). Defendant claims that the RTP on its games generally ranges from 96-98%.

73. Fourth, conditions designed to keep customers playing longer are indicative that the true purpose of the website is to keep them gambling, rather than a true sweepstakes aimed at promoting a product or service. Unlike traditional sweepstakes games where prizes can be claimed immediately, Defendant imposes restrictions on prize redemption that can cause website visitors to play longer. Specifically, website visitors must have at least 100 Sweeps Coins to obtain gift cards and 100 Sweeps Coins to obtain cash. This forces consumers to continue gambling and eventually lose their balance.

74. Fifth, most if not all users of the website largely ignore their ample supply of Gold Coins in favor of playing Sweeps Coins, which is a clear indication

that the Sweeps Coins, and not the supposedly promoted product (Gold Coins), are the primary subject of the transaction.

75. In short, Defendant is copying the Internet café playbook, but instead of selling Internet time, long-distance phone minutes, or small groceries coupled with supposedly "free" sweepstakes tokens, Defendant sells Gold Coins, which are then ignored so that players can gamble with the Sweeps Coins. The owners of a competitor gambling website that operates the same way as Modo.us in all material respects, called ChumbaCasino.com, publicly admitted in a securities filing that social casino gaming websites like Modo.us are modeled after illegal Internet cafés:

> 67 Over the last 10 years, 'Internet Sweepstakes Cafes' have evolved and proliferated across the US. They operate as internet cafes that offer their customers entrance into a sweepstakes draw upon the purchase of a product, often internet time or telephone call minutes. The participant can find out whether they have won the pre-determined draw by a simple reveal but many choose to do so through a programme that simulates a slot machine or poker game. This may even include an online element, but neither the presentation nor their interaction affects the outcome of the draw.
>
> 68 Increasingly sweepstakes gaming has emerged out of these cafes, with consumer products allowing 'free' entrance into games in which cash prizes can be won in return.

77. The prospectus also explains how, at the time, "Internet sweepstakes Cafes are reported to have turned over $10bn (€9.4bn) in 2015, with over 5,000 now operating in 12 states" (*id.* at 69) and described the "significant opportunity" of adopting the "sweepstakes café model." *Id.* at 95-96.

78. In sum, the parallels between Defendant's website and the Internet sweepstakes café business model—which courts have held are incontestably gambling—are clear:

- Both sell a “product” that comes with a commensurate number of “free” sweepstakes entries to play real money ‘casino-style’ games of chance in a ‘casino-like’ setting. Instead of the cafés selling a “prepaid phone card,” Defendant sells a virtual gold coin.
- Both run sweepstakes games perpetually and not on a limited and occasional basis, as is typical with legitimate promotional sweepstakes like the McDonald’s monopoly sweepstakes.
- Both offer casino-like payouts, typically 90% or more of revenues, whereas legitimate promotional sweepstakes normally have very low prize to entrant ratios.
- Both offer several ways to get free entries without requiring a product purchase, such as by mailing a postcard to a designated P.O. Box address, although the number of free entries awarded through this method is a very low amount, if anything at all.

79. Moreover, Modo does not offer free-play tokens at stores or other locations across the state of Minnesota.

80. Modo does not operate for a fixed duration to promote or market a product or service, Modo.us operates indefinitely and *is* the product or service.

**C. <u>Modo Promotes Gambling To Underage Minors</u>**

81. The National Institute of Health reports that "despite its illegality among adolescents, online gambling is a common practice, which puts their mental health and well-being at serious risk." J. Behav. Addict., 2021 Sept. 16;10(3):566-586. Some research indicates a "greater addictive potential of online gambling over traditional gambling, especially for young problem gamblers." This general vulnerability is due to the developmental characteristics of adolescence, where individuals are more likely to engage in risky behaviors and develop addiction problems due to immature self-regulation capacity, impulsivity, external locus of control, and susceptibility to contextual factors. *See id*. "They may be lured by the pop-up gambling advertisements, offers of gifts and free play, tempting easy win messages, thrill of many online games, and visually exciting graphics and photos presented with the games." *Id.*

82. The lower the age of online gambling onset, the higher the probability of developing problematic online gambling and the more severe the psychosocial consequences are.

83. According to a 2024 University of Michigan national poll on children's health, nearly a third of U.S. parents say that they or another adult in their household have participated in gambling. Among those households, two-thirds reported that their teen has a bank account or credit card in their own name, and one in six admitted they would not know if their own child was betting online.

84. Modo is exploiting this phenomenon for profit.

**D. <u>Defendant Misleads The Public With False Claims Of Legality</u>**

85. Modo also engages in fraudulent, false, misleading, or deceptive acts or practices in the conduct of trade or commerce by misleading and causing confusion that participation in Modo.us is legal in Minnesota.

86. In its terms and conditions, Modo lists the following "Restricted Territories" in the terms and conditions: Arizona, California, Connecticut, Delaware, Idaho, Indiana, Louisiana, Maine, Michigan, Montana, Nevada, New Jersey, New York, Tennessee, Washington, and West Virginia.

88. Modo does not include Minnesota as an excluded territory, although online casino gambling in any form is strictly prohibited by the State of Minnesota.

89. Further, Modo states that, if the user is in an excluded territory, the user would not be able to access or even use the platform, create an account, play the games, or interact with Modo in any other way. But Modo.us is accessible in Minnesota, which causes the users to believe that Minnesota permits such online gaming.

## VII. ALL PURPORTED CONTRACTS WITH DEFENDANT NEVER EXISTED

90. The entire contract, including the arbitration and delegation provisions, lack consideration and mutual assent.

91. The only consideration paid by Plaintiff and the Class members was wagers to gamble.

92. Under Minnesota law, contracts founded on gambling consideration are void and unenforceable. Minn. Stat. § 541.21 provides that every note, bill, bond, mortgage, or other security or conveyance in which the whole or any part of the consideration is money or goods won by gambling or betting is void.

93. More broadly, agreements made in furtherance of gambling prohibited by Minn. Stat. §§ 609.75–609.76 are illegal and unenforceable as contrary to Minnesota law and public policy.

94. Thus, no contract was ever formed between the parties, and any purported contract between Plaintiff and Defendant, and any contractually based defenses Defendant may raise, are likewise void.

95. And the entire contract is void: even if the arbitration provision were severed from the rest of any "contract," the arbitration provision itself rests entirely on gambling consideration and is therefore void and unenforceable under Minn. Stat. § 541.21 and Minnesota public policy.

96. Even if not void, the terms are unconscionable as the terms and conditions constitute an adhesion contract.

97. Plaintiff and Class members had no opportunity to negotiate the contract terms, and the terms never changed for any Class member.

98. Plaintiff and Class members had zero bargaining power.

99. Plaintiff and Class members could not have used Modo unless they agreed to the terms and conditions, and they could not have obtained comparable products or services unless they agreed to arbitrate.

100. The terms and conditions are not easily accessible, and the arbitration clause, damages limitation, and other material provisions are not conspicuous. Instead, they are buried in a sea of font, in the same color and same type, not bold or in capital letters, and don't require an independent signature or acknowledgement.

101. The terms and conditions also unconscionably limit Plaintiff's and Class members' damages, and do not afford them an opportunity to select or have a say in the arbitrator(s).

102. Moreover, the scope of the arbitration agreement, damages limitations, and other material provisions is too large, limiting all damages for every single claim against every single party, known or unknown.

103. The inclusion of a class action waiver is also unconscionable as the only practical effect is to chill or prevent claims, affording Modo immunity.

104. Moreover, the expenses and forum are unfair and unconscionable, as the cost to pursue individual arbitration likely exceeds the reward, further chilling and preventing claims and affording Modo immunity.

105. In sum, Plaintiff and Class members paid to forgo everything – inability to protect their statutory and constitutional rights – and Modo gains immunity at no cost. Plaintiff and Class members were not given a quid pro quo for agreeing to arbitrate and forgoing their constitutional right to a trial by jury.

106. Moreover, Plaintiff and Class members were fraudulently induced into entering these contracts. Modo misrepresented that it was legal in Minnesota, on which Plaintiff and Class members relied. Had Modo disclosed the truth that it is not legal in Minnesota, Plaintiff and Class members would not have entered into the contract with Modo.

107. Finally, the contract is illusory, since Modo reserves the right to change the terms at any time without prior notice.

## VIII. CLASS ACTION ALLEGATIONS

105. Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated.

106. The Plaintiff seeks to represent the following Minnesota Class ("Class") defined as:

All persons in Minnesota who have paid and lost money or other things of value on Modo.us within the applicable statute of limitations (the "Class").

107. Excluded from the Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case. Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

108. This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

109. **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**. The members of the Class are so numerous and geographically dispersed that individual joinder of all class members is impracticable. While Plaintiff is informed and believes that there are hundreds to thousands of members of the Class, the precise number of Class Members is unknown to Plaintiff, but may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

110. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant's alleged conduct violates applicable law;

c. Whether Modo.us is illegal gambling in Minnesota;

d. Whether Plaintiff and Class members wagered and lost money or other things of value on Modo.us in Minnesota;

e. The amount of money or other things of value wagered and lost by Plaintiff and Class members in Minnesota;

f. whether Defendant's conduct violates the Minnesota Consumer Fraud Act, Minn. Stat. §§ 325F.68–325F.70;

g. whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

h. the amount and nature of relief to be awarded to Plaintiff and the other Class members.

111. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the Class members wagered and lost money or other things of value on Modo.us in Minnesota. Also, neither Plaintiff nor the other Class Members would have participated on Modo.us had Defendant not engaged in fraudulent, false, misleading, or deceptive acts or practices in the conduct of trade or commerce. Plaintiff and the other Class

members suffered damages as a direct proximate result of the same wrongful practices in which Defendant engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

112. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because [his/her] interests do not conflict with the interests of the other members of the Class that [he/she] seeks to represent, Plaintiff retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and [his/her] counsel.

113. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole.

114. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered

by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims, so it would be impracticable for the Class members to individually seek redress. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

115. **Ascertainability –** Modo maintains a robust database with all its participants. Each participant must create an account to participate and must select and verify which state they are from. Modo also assigns each participant's account an individually identifiable number, and Modo tracks winnings and losses, because it controls how much a player can wager and cashout a day.

## IX. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### DECLARATORY JUDGMENT
### 28 U.S.C. §§ 2201 *et seq*.

132. Plaintiff incorporates by reference the allegations contained in preceding paragraphs of this complaint.

133. Plaintiff brings this count individually and on behalf of all other Class members.

134. Minnesota law strongly prohibits unlicensed gambling and confines lawful gambling to narrow, closely regulated exceptions.

135. Indeed, the Minnesota Constitution forbids the legislature from authorizing any lottery other than the lottery operated by the state. Minn. Const. art. X, § 8.

136. In Minnesota, a "bet" is "a bargain whereby the parties mutually agree to a gain or loss by one to the other of specified money, property or benefit dependent upon chance although the person's skill may also be a factor therein." Minn. Stat. § 609.75, subd.

137. Making a bet is a crime, Minn. Stat. § 609.755, as is operating a gambling place or receiving profits from gambling, Minn. Stat. § 609.76.

138. Under Minn. Stat. § 609.76, subd. 8, the value of chips or tokens approved for use in a game designed to be played with or operated by chips or tokens is the amount or denomination shown on the face of the chip or token in United States currency. Modo's Sweeps Coins operate the same way: they are purchased with U.S. currency, function as a proxy for U.S. currency, and are redeemable for U.S. currency on a 1:1 basis.

139. None of the statutory exceptions for what is "not a bet" under Minn. Stat. § 609.75, subd. 3, applies to Modo's operations, and Modo holds no license

under Minnesota's charitable gambling, lottery, or pari-mutuel statutes, nor does it operate under any tribal-state compact.

140. Under Minnesota law, the Chance Games are chance-based, not skill-based, because their outcomes are dependent upon chance — as Modo itself admits by disclosing that its primary games use a random number generator.

141. Modo operates an illegal gambling website wherein participants pay consideration for the chance to win a prize.

142. The Chance Games offered by Modo are predominantly games of chance and do not involve any meaningful level of skill.

143. The prizes Modo offers are valuable and can be used as or converted into US currency.

144. Modo operates an online casino, not a sweepstakes. The purported "sweepstakes" runs perpetually rather than for a limited promotional period; it pays out at casino-level rates of 92-96% rather than the small fraction of revenue typical of legitimate promotions; and Modo does not promote or market any bona fide good or service — the gambling *is* the good or service. Nor does the theoretical availability of free entries save Modo: the overwhelming majority of participants, including Plaintiff and the Class, paid real money for their chances, and the sale of Sweeps Coins to play games of chance for real-world prizes is illegal gambling under Minn. Stat. §§ 609.75–609.76 regardless of the label Defendant affixes to it. Minnesota's

Attorney General has likewise concluded that recasting casino chips as "virtual currencies" does not render such operations lawful.

145. Plaintiff and Class members each paid money or other things of value to Modo to play the Chance Games for the sole purpose of winning a prize (gift cards or cryptocurrency).

146. Plaintiff and Class members seek an order declaring that (1) Modo is illegal gambling in Minnesota and (2) all wagers placed and contracts formed in connection with Modo's Minnesota operations are void and unenforceable, as well as a permanent injunction enjoining Modo from operating in Minnesota, with disgorgement of profits.

147. Plaintiff and Class members also seek a speedy declaratory judgment hearing pursuant to Fed. R. Civ. P. 57.

## SECOND CAUSE OF ACTION
## Minnesota Gambling Loss Recovery Statute
## Minn. Stat. §§ 541.20–541.21

147. Plaintiff incorporates by reference the allegations contained in preceding paragraphs of this Complaint.

148. Plaintiff brings this count individually and on behalf of all other Class members.

149. Minnesota Statutes section 541.20 provides: "Every person who, by playing at cards, dice, or other game, or by betting on the hands or sides of such as are gambling, shall lose to any person so playing or betting any sum of money or

any goods, and pays or delivers the same, or any part thereof, to the winner, may sue for and recover such money by a civil action, before any court of competent jurisdiction."

150. Plaintiff is similarly situated to the other Class members, as each are Minnesota residents who have paid and lost money or other things of value on Modo within the applicable limitations period.

151. Modo operates an illegal gambling website that is accessible in Minnesota. Playing Modo's Chance Games constitutes "playing at cards, dice, or other game" and betting within the meaning of Minn. Stat. § 541.20.

152. Within the applicable limitations period, Plaintiff and other Class members played Modo's games of chance, paid and lost money or other things of value on Modo, and paid and delivered those sums to Modo, the winner of the wagers.

153. Plaintiff and other Class members demand recovery of the money or other things of value paid and lost on Modo within the applicable limitations period in an amount to be determined at trial, including interest.

154. Plaintiff and Class members also seek an order declaring that (1) Modo is illegal gambling in Minnesota and (2) all wagers placed and contracts formed in connection with Modo's Minnesota operations are void and unenforceable under

Minn. Stat. § 541.21 and Minnesota public policy, as well as a permanent injunction enjoining Modo from operating in Minnesota, with disgorgement of profits.

**<u>THIRD CAUSE OF ACTION</u>**
**Minnesota Consumer Fraud Act**
**Minn. Stat. §§ 325F.68–325F.70; Minn. Stat. § 8.31, subd. 3a**

155. Plaintiff incorporates by reference the allegations contained in preceding paragraphs of this Complaint.

156. Plaintiff brings this count individually and on behalf of all other Class members.

157. Defendant, Plaintiff, and Class members are "persons" within the meaning of the Minnesota Consumer Fraud Act ("MCFA"), Minn. Stat. § 325F.68, subd. 3.

158. Defendant offered "merchandise" within the meaning of the MCFA. "Merchandise" is defined broadly to include "any objects, wares, goods, commodities, intangibles, real estate, loans or services." Minn. Stat. § 325F.68, subd. 2. Defendant's Gold Coins, Sweeps Coins, and the casino-style gaming services available on Modo.us each constitute "merchandise" within the meaning of the MCFA.

159. Defendant is engaged in "trade" or "commerce" within the meaning of the MCFA. Defendant sells merchandise to Minnesota consumers through Modo.us and derives substantial revenue from those transactions.

160. The MCFA, Minn. Stat. § 325F.69, subd. 1, prohibits "[t]he act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." An act or practice is "unfair or unconscionable" under Minn. Stat. § 325F.69, subd. 8, if it: (1) offends established public policy; (2) is unethical, oppressive, or unscrupulous; or (3) is substantially injurious to consumers.

161. Defendant violated the MCFA by misrepresenting, or causing confusion or misunderstanding, that gambling on Modo.us is legal and permitted in Minnesota, when in fact it is an illegal gambling operation. Defendant's violations include, without limitation, the following fraudulent, false, misleading, and deceptive acts and practices in connection with the sale of its merchandise:

a. falsely representing that Modo.us is a legal "sweepstakes" platform and "social gaming" service rather than an illegal online gambling operation, causing consumers to believe that participation in Modo.us is approved or certified as lawful in Minnesota;

b. omitting Minnesota from its list of "Restricted Territories" in its terms and conditions, and affirmatively representing that users not in a Restricted

Territory may freely access and use the platform, thereby misleading Minnesota consumers into believing their participation is lawful;

c. representing that Sweeps Coins are a "free bonus" provided with the purchase of Gold Coins, when in fact Sweeps Coins function as casino chips purchased with real money at a near-1:1 ratio, redeemable for cash at a 1:1 ratio, and are the primary subject of the transaction;

d. deceiving or confusing consumers into believing that the gambling transactions confer or involve certain rights, remedies, or obligations—such as the right to recover winnings and the obligation to pay for losses, when in fact any such rights, remedies, or obligations arising from illegal gambling contracts are void and prohibited by Minnesota law, Minn. Stat. §§ 541.20–541.21; and

e. representing that website users will receive an economic benefit in the form of gambling winnings, when in fact the receipt of any such benefit is contingent on an event, winning the bet, that occurs subsequent to the consummation of an illegal transaction.

162. Defendant's conduct further constitutes "unfair or unconscionable" acts or practices under Minn. Stat. § 325F.69, subd. 8, because: (1) Modo's conduct offends the public policy established by Minnesota's criminal gambling statutes, Minn. Stat. §§ 609.75–609.76, and the Minnesota Constitution, art. X, § 8; (2) it is

unethical, oppressive, and unscrupulous to target Minnesota consumers with an illegal gambling operation while deliberately disguising it as a lawful sweepstakes; and (3) it is substantially injurious to consumers who have lost money on Modo.us based on the false belief that their participation was legal.

163. To the extent required by law, Defendant owed a duty to Plaintiff and the Class because disclosure that participation on Modo.us is illegal in Minnesota was necessary to dispel the misleading impression, created by Defendant's own website, marketing, and terms and conditions, that participation was lawful.

164. Defendant's unfair and deceptive acts and practices were likely to, and did in fact, deceive Plaintiff and Class members about the true approval, legality, and nature of its merchandise and services in Minnesota. Defendant acted with knowledge and intent to deceive, Modo knew that online gambling is illegal in Minnesota, was notified by the Minnesota Attorney General's November 2025 letters that its operations violate Minnesota law, and nonetheless continued to operate and accept wagers from Minnesota residents.

165. Defendant's violations present a continuing risk to Plaintiff, Class members, and the general public. Defendant's unlawful acts and practices complained of herein affect the public interest and this action is brought for the public benefit.

166. Plaintiff and Class members suffered ascertainable losses and actual damages as a direct and proximate result of Defendant's conduct. Plaintiff and other Class members would not have participated on Modo.us and would not have purchased Gold Coins, Sweeps Coins, or any other merchandise from Defendant had Defendant disclosed the true nature of Modo.us as an illegal gambling operation.

167. Pursuant to Minn. Stat. § 325F.70, subd. 3 (private enforcement, effective August 1, 2023) and Minn. Stat. § 8.31, subd. 3a (Private Attorney General Statute), Plaintiff and the Class seek an order enjoining Defendant's unfair and deceptive acts and practices, and awarding actual damages, costs and disbursements, costs of investigation, reasonable attorneys' fees, and any other just and proper relief available under the MCFA. Because Defendant does not maintain a place of business and does not keep assets in Minnesota, no pre-suit notice to Defendant was required.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment in their favor and against Defendant, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's attorneys as Class Counsel;

B. Declaring that Modo.us is illegal gambling in Minnesota and that all wagers placed and contracts formed in connection with Modo's Minnesota operations are void and unenforceable;

C. Entering a permanent injunction permanently enjoining Defendant from operating Modo.us in Minnesota;

D. Ordering Defendant to refund all wagers lost by the Class and pay actual and statutory damages and restitution and disgorgement of profits to Plaintiff and the Class, as allowable by law;

E. Ordering Defendant to pay both pre- and post-judgment interest on any amount awarded;

F. Ordering Defendant to pay attorneys' fees and costs of suit; and

G. Ordering such other and further relief as the Court may deem just, equitable, and proper.

## **JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 23, 2026

Respectfully submitted,

*/s/ Bryan L. Bleichner*

Bryan L. Bleichner (MN #0326689)
Christopher P. Renz (MN # 0313415)
Gary K. Luloff (MN # 0389057)
Philip J. Krzeski (MN #0403291)
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue S, Ste 1700

Minneapolis, MN 55401
Phone: (612) 339-7300
Fax: (612) 336-2940
bbleichner@chestnutcambronne.com
crenz@chestnutcambronne.com
gluloff@chestnutcambronne.com
pkrzeski@chestnutcambronne.com

W. Daniel "Dee" Miles, III
James Mitchell Williams
Trenton H. Mann
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C**.
272 Commerce Street
Montgomery, Alabama 36103-4160
T: (334) 269-2343/ F: (334) 954-7555
mitch.williams@beasleyallen.com
dee.miles@beasleyallen.com
Trent.mann@beasleyallen.com